UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
JESSICA C. GRAHAM,

                    Plaintiff,

                                  **REPORT AND RECOMMENDATION**
                                     **14 CV 5815 (EK)(LB)**

      -against-

P.O. ANTHONY FERRETTI, P.O. ROBERT ADAMS,
VALERI MATTEO, FRANK CALLAGHAN,
DETECTIVE ROBERT REED, GEORGE MARTINE,
DANIELLE SINGER, YULY DELAPENA,
DETECTIVTE GEORGE BONNER, GUIUSEPPE
CARUSO, JAMES HOWE, STANSILAV ZUBYK,
JASON PORTEE, JOHN BONANNO, DOMINIC
BOTTA, GIUSEPPE SICILIA, DOMINIC LEPORE,
THOMAS SABBIO, STEVEN NICHOLAS, TERRENCE
 HURSON, EDWARD LEISENGANG, BRIAN
JOHNSON, RICHARD OCASIO, ROBERT TALATALA,
STEVEN CONSENTINO, DEREK DEHORTA, SEAN
MCHUGH, ALFRED LOBAITO, MATTHEW
MUSCARELLO, PATRICIA O'BRIEN, HENRY
RIVERO, RONALD ZEDALIS, PAUL FAZIO, PAUL
MELLONE, GENEE PARKER, NICHOLAS GRAVINO,
SEAN PATTERSON, DETECTIVE EDWARD WASZAK,
DETECTIVE VLAD GREEN, DETECTIVE MICHAEL
LANGAN, DETECTIVE JAMES COLL, DETECTIVE
MICHAEL O'NEILL, P.O. OFFICER NICHOLAS
GENTILE, DETECTIVE MATTHEW BRANDER,
P.O. ANDREW LEIPER, NICHOLAS CIANNA,
COURT OFFICER STEPHEN TOSCANINI,

                    Defendants.
-----------------------------------------------------------------X
**BLOOM, United States Magistrate Judge:**

      Plaintiff Jessica Graham, also known as Jessica Szabo,[1] brings this *pro se* civil rights action

under 42 U.S.C. § 1983 alleging that defendants violated her constitutional rights by using excessive

force and falsely arresting her during a series of incidents that occurred between October 2013 and

---

[1] Graham is plaintiff's maiden name; Szabo is her ex-husband's surname. Plaintiff has filed cases in this Court using both surnames. See e.g., Szabo v. City of New York et al, Case No. 16-cv-3683.

August 2015 at the Richmond County Family Court ("RFC"), the Richmond County University Medical Center ("RUMC"), and plaintiff's home on Staten Island. Defendants move for summary judgment on all claims pursuant to Fed. R. Civ. P. 56. Two separate motions for summary judgment have been filed: one by five New York State Court Officers ("the State Defendants")[2] and one by 42 New York Police Officers and Emergency Medical Technicians ("EMTs") ( collectively, "the City Defendants").[3] The Honorable Eric R. Komitee referred defendants' motions to me for a Report and Recommendation pursuant to 28 U.S.C. § 636(b).[4] For the reasons set forth below, it is respectfully recommended that the State Defendants' motion for summary judgment should be granted and the City Defendants' motion for summary judgment should be granted in part and denied in part.

## FACTS[5]

The following facts are taken from plaintiff's Second Amended Complaint ("SAC"), ECF No. 72, the exhibits filed with defendants' summary judgment briefing,[6] and defendants' Local Civil Rule

---

[2] The State Defendants are Captain John Bonanno, Sergeant Dominic Botta, Sergeant Giuseppe Sicilia, and Officers Stephen Toscanini and Dominick Lepore.

[3] The City Defendants are Police Officers Valerie Matteo, Frank Callaghan, Detective Robert Reed, George Martine, Danielle Singer, Yuly DelaPena, Detective George Bonner, Anthony Ferretti (retired), Robert Adams, Stanislav Zubyk, Jason Portee, Sergeant Thomas Sabbio, Lieutenant Steven Nichols, Deputy Inspector Terence Hurson, Sergeant Edward Leisengang, Brian Johnson, Richard Ocasio, Robert Talatala, Steven Cosentino, Derek DeHorta, Sean McHugh, Alfred Lobaito, Sergeant Matthew Muscarello, Detective Patricia O'Brein, Detective Henry Rivero, Captain Ronald Zedalis, Detective Paul Fazio, Detective Paul Mellone (retired), Detective Genee Parker, Sergeant Nicholas Gravino, Lieutenant Sean Patterson, Detective Edward Waszak (retired), Detective Vlad Green, Detective Michael Langan, Detective James Coll (retired), Detective Michael O'Neill, Nicholas Gentile, Detective Matthew Brander, Andrew Leiper, Detective Nicholas Scianna (retired), and EMTs Giuseppe Caruso and James Howe.

[4] On February 3, 2020, this case was reassigned from the Honorable Pamela K. Chen to the Honorable Eric R. Komitee.

[5] Unless otherwise stated, the facts are not in dispute.

[6] Despite being given several extensions of time, plaintiff did not file an opposition to defendants' motions. See April 5, 2021 Order; April 8, 2022 Order; May 19, 2022 Order.

56.1 Statements of Facts, State Defendants' Rule 56.1 Statement of Facts ("State Defs' 56.1 Stmt."), ECF No. 336, City Defendants' Rule 56.1 Statement of Facts ("City Defs' 56.1 Stmt."), ECF No. 364. [7] Defendants provided plaintiff with requisite notice under Local Rule 56.2. See ECF Nos. 334, 367.

The events giving rise to this action took place on five dates between October 2013 and August 2015 at plaintiff's home, the RFC, and the RUMC. The nature and circumstances of these events are unfortunate and were clearly challenging for everyone involved. Plaintiff had a long-running custody dispute with her ex-husband over her young son which resulted in her loss of the child's custody. This custody battle was a prolonged and traumatic experience for plaintiff and plaintiff went to the RFC almost daily in 2013 and 2014 and on occasion in early 2015. Transcript of Plaintiff's Deposition ("Pl. Dep. Tr."), ECF No. 365-1, 32:21-24. [8] Plaintiff frequently called 9-1-1 from the RFC, behaved erratically, and had conflict with courthouse staff including judges. This created an impossible situation for the RFC staff who had no good option: either they would allow plaintiff to disrupt daily functions at the courthouse, or staff could arrest her on criminal charges or detain her for psychiatric

---

[7] Rule 56.1 of the Local Civil Rules of the United States District Courts for the Southern and Eastern Districts of New York ("Local Rule 56.1") requires a party moving for summary judgment to submit "a separate, short and concise statement" of the allegedly undisputed material facts, set out in numbered paragraphs, on which the moving party relies in arguing that there is no genuine issue to be tried. See Local Rule 56.1(a); see also Gianullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003); Holtz v. Rockefeller & Co., Inc., 258 F.3d 62, 72 (2d Cir. 2001). The Court may not rely solely on the statement of undisputed facts contained in the Rule 56.1 statement: "[i]t must be satisfied that the citation to the evidence in the record supports the assertion." Vt. Teddy Bear Co., Inc. v. 1-800 Beargram Co., 373 F.3d 241, 244 (2d Cir. 2004); see Gianullo, 322 F.3d at 143 n.5. Although a plaintiff's failure to respond or contest the facts set forth in a Rule 56.1 statement generally constitutes an admission of those facts, the Court has thoroughly reviewed the record and deems admitted only those facts in defendants' Rule 56.1 statement that are supported by admissible evidence and not controverted by the record.

[8] Some excerpts of plaintiff's deposition are filed with the City Defendant's motion, ECF No. 365-1, and other excerpts are filed with State Defendant's motion, ECF No. 337-1. Citations to the transcript refer to the original document's page numbers, not the ECF page numbers.

evaluations against her will. As detailed in plaintiff's complaint, these encounters with defendants only increased plaintiff's distrust of the justice system.

### October 4, 2013

On October 4, 2013, at approximately 5:00 p.m., NYPD officers removed plaintiff from her grandparents' apartment on Staten Island where she lived at the time. State Defs' 56.1 Stmt. ¶ 8; City Defs' 56.1 Stmt. ¶ 5; SAC ¶ 20. Among the officers who arrived at the home were defendants Matteo, Callaghan, Reed, and Bonner.[9] City Defs' 56.1 Stmt. ¶ 5. Plaintiff alleges that she was cleaning her room in the attic when officers "entered into [her] home like they lived there," Pl. Dep. Tr. 87:25-88:1, in order to "take [her] out of [her] home illegally and take [her] to the hospital against her will," id. at 86:10-13. The City Defendants state that one of plaintiff's grandparents called 9-1-1, because plaintiff was "acting bizarre," yelling "I have bed bugs," screaming obscenities, and claiming that her elderly grandfather had "beat her up." City Defs' 56.1 Stmt. ¶ 3. Based on the 9-1-1 call, the officers determined that plaintiff was an emotionally disturbed person ("EDP") who needed to be brought to the hospital for a psychological evaluation. City Defs' 56.1 Stmt. ¶ 6.

Officers Matteo and Callaghan went into plaintiff's bedroom and asked plaintiff to go with them to the hospital. City Defs' 56.1 Stmt. ¶ 7. When she refused, one of the officers handcuffed plaintiff behind her back and walked her down the first flight of stairs. City Defs' 56.1 Stmt. ¶ 9; Pl. Dep. Tr. 91:14-16. At her deposition, plaintiff stated she was not handcuffed "in an excessive force manner." Pl. Dep. Tr. 92:11-14. However, when plaintiff refused to walk down the second flight of stairs, the officers put her on the floor, lifted her, and carried her to the ground level. City Defs' 56.1 Stmt. ¶ 10. Defendants allege that plaintiff was "placed" on the floor before she was lifted and carried, id., but plaintiff alleges that she was "body slammed" and that her face made contact with the ground.

---

[9] Plaintiff clarified at her deposition that with regard to the October 4, 2013 incident, she alleges excessive force against Matteo and Callaghan and failure to intervene against Reed and Bonner. Pl. Dep. Tr. 114:6-116:1.

Pl. Dep. Tr. 95:15-96-1. Plaintiff did not sustain any injuries. City Defs' 56.1 Stmt. ¶ 11; Pl. Dep. Tr. 100:20-22.

When plaintiff was brought outside, defendants state that plaintiff refused to sit on the stretcher and so Velcro straps were used to restrain her legs while defendants placed her inside the ambulance. City Defs' 56.1 Stmt. ¶ 13. Plaintiff alleges that defendants body slammed her face down onto the stretcher. Pl. Dep. Tr. 100:3-19.

Plaintiff was transported to the RUMC by ambulance. City Defs' 56.1 Stmt. ¶ 14; City Defs' Pl. Dep. 104:1-5. The RUMC emergency department physician's notes report that, upon entering the ER, plaintiff yelled "I have bed bugs everyone!" and that plaintiff was hallucinating and in distress. RUMC Medical Records ("RUMC Med. Rec."), ECF No. 365-2. Plaintiff alleges that after she was escorted into a holding room, defendant Officer Callaghan attempted to break her arm by twisting it. Pl. Dep. Tr. 104:18-105-20; SAC ¶ 35. Plaintiff felt pain in her arm but never received treatment. Pl. Dep. Tr. 110:8-112:5. Defendants state that plaintiff was physically resisting the hospital staff, so Officers Matteo and Callaghan assisted a nurse in holding plaintiff down so that the emergency room nurse could sedate her. City Defs' 56.1 Stmt. ¶ 18; Pl. Dep. Tr. 112:8-24. Plaintiff physically resisted the treatment because she was "being injected against [her] will." Pl. Dep. Tr. 112:14-24. Plaintiff "went to sleep immediately" and was evaluated for approximately five and half hours, according to hospital records, before she was discharged. Pl. Dep. Tr. 108:18-22.

### April 9, 2014

On April 9, 2014, plaintiff went to the New York City Administration of Children's Services ("ACS") to obtain a letter so that she could file a Person in Need of Supervision ("PINS") petition for her son. Pl. Dep. Tr. 116:1-117:20; SAC ¶ 82. ACS denied plaintiff's request for a PINS petition because there was an active Court Order of Protection against her by her son and ex-husband. SAC ¶

82.[10] Plaintiff argued with ACS staff. Pl. Dep. Tr. 118:14-15. Plaintiff says that she called 9-1-1 because "under the law a police officer can obtain [a PINS petition]." Pl. Dep. Tr. 117:21-24. Defendants claim that ACS staff asked plaintiff to leave several times, but that she refused; ACS then called 9-1-1 for help. Plaintiff claims that she was never asked to leave and that she was told to sit down and wait until officers arrived. Pl. Dep. Tr. 118:17-20, 128:15-25.

Defendant NYPD Officers Feretti and Adams responded to the 9-1-1 call. Trespass Supporting Affirmation of NYPD Officer Anthony Ferretti ("Ferretti Trespass Aff."), ECF No. 365-14; SAC ¶ 93. An ACS employee, "W. Jessamy," told the officers that plaintiff was not authorized to be in the building. Ferretti Trespass Aff. The officers claim that they instructed plaintiff to leave multiple times and after 30 minutes, the officers arrested plaintiff for trespassing. Id. According to plaintiff, however, the officers never asked her to leave before arresting her and she was placed in handcuffs about five minutes after their arrival. Pl. Dep. Tr. 126:6-127:7. Plaintiff also claims that ACS lied to the officers when ACS said that they had asked her to leave. Pl. Dep. Tr. 129:3-11.

Ferretti and Adams brought plaintiff to the 120th precinct for processing. SAC ¶ 94; Pl. Dep. Tr. 127:16-127:21. Plaintiff alleges that, at the precinct, a third officer threatened to kill plaintiff. SAC ¶ 95; Pl. Dep. Tr. 130:14-25. Plaintiff also claims that she was pushed against a wall. SAC ¶ 96; Pl. Dep. Tr. 129:14-130:25, 138:7-9. It is unclear whether the same officer who allegedly threatened plaintiff pushed her against the wall.[11] Plaintiff described these events as unprovoked attacks. Pl. Dep.

---

[10] Plaintiff alleges that the Temporary Orders of Protection were "fake" because they were issued by a Court Attorney Referee and not a Judge. SAC ¶ 82.

[11] Plaintiff's SAC explicitly states that it was Delapena who threatened plaintiff and Singer who pushed plaintiff. SAC ¶¶ 95–96. However, during her deposition, plaintiff testified that a single officer named Danielle pushed and threatened her. Pl. Dep. Tr. 132:14-17. (Officer Singer's first name is Danielle). She later states that Singer is "the officer who assaulted me on April 9th, 2014." Id. at 138:7-9. When asked about why she is suing Delapena, plaintiff replied "I don't know which one that is." Id. at 138:2-3.

Tr. 130:21-25. Plaintiff was not injured and did not seek medical attention after the alleged attacks. Id. 131:21-132:7.

**March 20, 2015**

On March 18, 2015, after a hearing in her son's custody case, plaintiff attempted to make a "citizen's arrest" of Judge Karen Wolff for "obstruction" and called 9-1-1 to request NYPD assistance. City Defs' 56.1 Stmt. ¶¶ 46–47; Pl. Dep. Tr. 261:13-264:7. The next day, on March 19, 2015, plaintiff was arrested twice, once for assaulting a police officer and lieutenant and once for a domestic violence incident involving her ex-husband's girlfriend. City Def's 56.1 Stmt. ¶ 49; Pl. Dep. Tr. 202:13-204:1. That same day, March 19, 2015, Judge Wolff issued an order awarding plaintiff's ex-husband permanent custody of their son. City Defs' Pl. Dep. 138:22-139:10.

The next day, March 20, 2015, plaintiff went to the RFC and, before entering the Courthouse, she called 9-1-1 to report that the Court was issuing "fraudulent" Orders. Pl. Dep. Tr. 138:23-139:24; 426:3-12. Defendant Court Officer Botta saw plaintiff at the clerk's window, demanding that the Assistant Deputy Clerk arrest Judge Wolff and blocking other litigants who were waiting to file papers. State Defs' 56.1 Stmt. ¶¶ 19–20; Declaration of Dominic Botta ("Botta Decl."), ECF No. 340-4, ¶¶ 16–18. Botta believed that plaintiff was an EDP and that her conduct constituted disorderly conduct, so he called emergency medical services ("EMS") for assistance. State Defs' 56.1 Stmt. ¶¶ 19–22. Plaintiff alleges that she tried to leave the building to meet with the NYPD officers she had called to the building when Botta and Toscanini "kept [her] detained in the lobby of the Court…under the orders of [Bonanno]." Pl. Dep. Tr. 381:19-25.

When several unidentified NYPD officers arrived at the RFC, Pl. Dep. Tr. 408:22-409:4, one officer determined that plaintiff was an EDP and detained her. Pl. Dep. Tr. 415:20-24. Officers Ferretti and Adams arrived at the RFC after plaintiff was already handcuffed. City Defs' 56.1 Stmt.

¶ 60; Pl. Dep. Tr. 412:3-12. At her deposition, plaintiff testified that no force was used in handcuffing her or removing her from the RFC. Pl. Dep. Tr. 145:10-18.

When the ambulance arrived, plaintiff refused to be seat belted and told the officers, "if you put me in the gurney, I'm going to kick you in the face." NYPD Complaint Report Dated 5/20/15 ("5/20/15 Rep."), ECF No. 365-6 at 5. Officers Ferretti and Adams and EMTs Caruso and Howe attempted to hold plaintiff down to secure her to the stretcher. State Defs' 56.1 Stmt. ¶ 64. Plaintiff then "slid down the gurney" and kicked Officer Ferretti in the face, causing a facial contusion, swelling and bruising to his mouth. City Defs' 56.1 Stmt. ¶ 66; 5/20/15 Rep at 5. Once transported to the RUMC, plaintiff underwent a psychiatric evaluation and was released back to NYPD custody where she was charged with Assault in the Second Degree for kicking Officer Ferretti. Pl. Dep. Tr. 150:24-151:7.

**June 24, 2015** [12]

On June 24, 2015, plaintiff went to the RFC to file a motion in her ongoing custody case. Pl. Dep. Tr. 156:13-157:2. At around 9:30 a.m., plaintiff called 9-1-1 to file a police report against her ex-husband for allegedly violating an order of protection. Id. at 157:3-18. Defendant NYPD Officers Portee and Zubyk arrived at the RFC to respond to the call. Id. at 157:19-20. Portee spoke with plaintiff, completed a domestic violence report, and the officers left the courthouse. Id. at 157:22-158:5. Plaintiff reviewed the report, thought that the report was incorrect, and again called 9-1-1. SAC ¶ 136; State Defs' Pl. Dep. 158:9-14.

---

[12] The City and State Defendants do themselves and the Court a disservice by excerpting pages of plaintiff's deposition transcript in a piecemeal manner. Defendants' submission makes it very challenging for the Court to follow the events on June 24, 2015, especially with so many defendants and several similar but different reports. Defendants' counsel should not require the Court to have to piece together pages of the transcript from the State and City Defendants' respective briefings in order to decide their motions.

Portee returned to the courthouse and plaintiff claims that he "came running up the stairs and charge[ed] [her] like an animal." Pl. Dep. Tr. 158:9-159:7. The RFC security camera recorded the interaction in the waiting room on video.[13] The video does not show that Portee charged plaintiff, but instead shows that plaintiff approached the entrance to speak with members of the NYPD. Video 10:26:30. Plaintiff quickly walked away from Portee and Zubyk and the officers followed her. Id. 10:26:48. The video shows defendant Sergeant Sicilia observing the NYPD officers as they approach plaintiff. Declaration of Giuseppe Sicilia ("Sicilia Decl."), ECF No. 342 at ¶¶ 15–17, 21; see also, Pl. Dep. Tr. 312:4-6 ("Q: [Sicilia is] not part of this attempt to detain you? A: No."). One of the officers reached out to grab plaintiff's arm, but plaintiff pulled her arm away. Id. 10:26:45-10:26:48. Plaintiff testified that she was trying to avoid being detained, because there was no probable cause. Pl. Dep. Tr. 318:15-319:1.

Plaintiff then walked to the corner of the waiting room, just outside the camera's view; however, the video shows some of the officers struggling as they attempted to handcuff plaintiff. Video 10:26:50-10:27:56; Pl. Dep. Tr. 319:2-6 ("A: I think I was wiggling a little bit"). While plaintiff is outside the video frame, she tripped, "went down to the ground," and became "tangled" with Portee. Pl. Dep. Tr. 512:21-24; State Defs' 56.1 Stmt. ¶ 77(f). While plaintiff was on the ground, she kicked one of the officers in the groin. Pl. Dep. Tr. 172:7-11. Sicilia and Lepore assisted the NYPD officers as they restrained and handcuffed plaintiff. State Defs'. 56.1 Stmt. ¶ 42. Once plaintiff was handcuffed, Sicilia and Lepore stepped away. Id.

When plaintiff stands up, she is again visible on the video. Video 10:27:56. The City Defendants state that plaintiff "[continued] to throw herself to the ground." Defs' 56.1 Stmt. ¶ 77(k).

---

[13] See ECF No. 338, Certification of Business Record. A copy of the recording was included with defendants' motion and is hereinafter referred to as "Video." Where, as here, the events were captured on video, the Court should view the facts "in the light depicted by the video tape." Scott v. Harris, 550 U.S. 372, 381 (2007). The Court notes that the video does not include sound.

However, the video shows that the officer holding plaintiff with her arms behind her back quickly turned plaintiff around and pushed her forward, causing plaintiff to trip and fall forward to the ground. Video 10:28:01-10:28:05; Pl. Dep. Tr. 295:17-19 ("A: It looked like I tripped […] they were trying to get me to walk with them"). The video ends as officers bring plaintiff out of the waiting room and into a hallway. Plaintiff alleges that, while in the hallway, the officers "body slammed" her to the floor and pinned their weight on her so that she could not breathe. SAC ¶ 139, Pl. Dep. Tr. 159:24-160:7, 331:5-21 ("At the end of the video, when we exited out of the lobby area, that's where the hallway was and that's where they took me down facedown.")

Plaintiff was brought by EMS to the RUMC for a psychiatric evaluation. Pl. Dep. Tr. 166:5-14. She was discharged after "about an hour or so" and was not criminally charged as a result of the incident. SAC ¶ 145–46. After she was released, plaintiff reports that she returned to the RFC. SAC ¶ 147. Three days later, plaintiff sought medical attention at Staten Island University Hospital. Pl. Dep. Tr. 333:13-20.

### August 12, 2015

On August 12, 2015, at around 1:30 p.m., James Whaley and JoAnne Perotta, social workers with the Richmond University Mobile Crisis Unit ("Mobile Crisis Unit"), went to plaintiff's home for an unscheduled mental health evaluation. SAC ¶ 161. According to Detective Genee Parker's Complaint Follow-up Report ("Parker Report"), the Mobile Crisis Unit received a referral call from Lieutenant Nichols who reported that plaintiff was displaying paranoid thoughts and behaviors, but that he was "unaware if she has suicidal or homicidal thoughts." ECF No. 365-11. Plaintiff refused to speak with the social workers because, "they're not [her] mental health service providers," and she yelled out her window that they should get off her property or else she would have them arrested. Pl. Dep. Tr. 177:1-23.

Plaintiff called 9-1-1 and told the operator that two individuals, possibly "terrorists" were "stalking and harassing [her]." Plaintiff 911 Call.[14] Whaley also called 9-1-1, reporting that he was sent by LifeNet for a mental health evaluation, that plaintiff was acting paranoid and delusional, and he requested assistance. Whaley 911 Call. NYPD Officers arrived at plaintiff's home and spoke with plaintiff's mother, Jennifer Graham, who informed the officers that plaintiff was upset that the court had awarded custody of her son to plaintiff's ex-husband. Parker Report. Plaintiff told defendant Lagan that her son was "abducted and is possibly being used as a drug mule for drug trafficking out of the Country." SAC ¶ 169. Plaintiff told the officers that she would not leave her home and that she would "defend herself" if they attempted to enter. Parker Report. Over the next several hours, plaintiff periodically spoke with the Hostage Negotiation Team, ESU, and other police officers. Id.

In order to bring plaintiff to the hospital for a psychiatric evaluation, Whaley completed an "Authorization for Transport" affidavit, stating that plaintiff appeared to be "mentally ill" and was "conducting [herself] in a manner likely to result in serious harm to [herself] or others]," and defendant Langan obtained a mental health warrant. ECF No. 365-23, Whaley Affidavit, ("Whaley Aff.").

When the ESU went to the door to show plaintiff the warrant, plaintiff was holding a "large butcher knife" in her hand. Pl. Dep. Tr. 183:6-8. Plaintiff claims that she was holding the knife to wash it. Id. 185:20-21. When plaintiff put the knife down, ESU entered the home and handcuffed plaintiff. Id. 187:23-25. Plaintiff alleges that she was "body slammed" and sustained a bruise to her knee. Id. 188:8-16. Plaintiff could not identify the officers who arrested her because they wore SWAT gear, and she could not see their faces. Pl. Dep. Tr. 188:4-7. Plaintiff was brought to the RUMC

---

[14] The City Defendants submit an audio file of plaintiff's August 12, 2015 9-1-1 call ("Plaintiff 911 Call"), ECF No. 365-10, and Whaley's 9-1-1 Call ("Whaley 911 Call"), ECF No. 365-9, with their motion for summary judgment.

psychiatric unit where, upon the review of two examining physicians, plaintiff was involuntarily committed for 19 days. Pl. Dep. Tr. 189:18-21; RUMC Med. Rec. at 15; SAC ¶ 178.


## PROCEDURAL HISTORY

Plaintiff filed the original complaint in this *pro se* action on October 2, 2014. ECF No. 1. Plaintiff was granted permission to proceed in forma pauperis, ECF Nos. 2, 7, but Judge Chen dismissed "all claims asserted by Plaintiff relating to the custody of her child" for lack of subject matter jurisdiction. ECF No. 7. Judge Chen also directed the Office of the Corporation Counsel to identify the John and Jane Doe officers allegedly involved in plaintiff's claims of excessive force and false arrest and to provide addresses where the identified defendants could be served. Id.[15]

Plaintiff filed her Second Amended Complaint ("SAC"), the operative complaint in this matter, on February 23, 2016.  ECF No. 72. The Court prohibited plaintiff from further amending the complaint. ECF No. 74; see also ECF No. 166 ("It is simply too complicated to amend again."). Plaintiff voluntarily dismissed numerous claims against unidentified defendants and municipal agencies. ECF Nos. 76, 178, 180.

Defendants moved to dismiss the SAC, ECF Nos. 192, 107, 185, 199, and those motions were referred to me for a Report and Recommendation. See Aug. 18, 2017 Order. I recommended that defendants' motions should be granted in part and denied in part. ECF No. 216. Specifically, I recommended that plaintiff's claims of false arrest and excessive force on October 4, 2013, April 9, 2014, March 20, 2015, June 24, 2015, and August 12, 2015 against the City and State defendants

---

[15] Plaintiff brought this suit against 75 defendants. ECF No. 1. The Court and defendants' counsel made great efforts to ascertain the identities of the John and Jane Doe defendants. See, e.g., ECF Nos. 60, 61, 64, 65, 67, 68, 70, 71, 74, 77, 78, 79, 80.

should proceed.[16] Judge Chen adopted my Report in its entirety but additionally granted the State defendants' motion to dismiss plaintiff's Eighth Amendment claim for excessive force regarding the June 24, 2015 incident. ECF No. 219.

The remaining defendants answered plaintiffs' SAC, ECF Nos. 227–232, and discovery commenced on May 1, 2018, ECF No. 234. On August 13, 2018, plaintiff stipulated to dismiss the excessive force claim against the State defendants regarding the March 20, 2015 incident. ECF No. 245. The parties conducted discovery and discovery closed on October 28, 2019,[17] however, the Court reopened discovery to allow defendants to re-depose plaintiff when plaintiff reversed her decision regarding the stipulation dismissing the March 20, 2015 incident. See November 22, 2019 Order.[18]

On March 31, 2020, the City Defendants reported that they had reached a settlement in principle with plaintiff regarding the instant action and plaintiff's companion case, Szabo v. City of New York et al, Dkt. No. 16-cv-0368. ECF No. 291. After the Court granted two extensions of time for the parties to file a stipulation dismissing plaintiff's claims against the City Defendants, see May 28, 2020 and June 3, 2020 Orders, the Court held a status conference and plaintiff reported that she no longer wished to settle her cases. July 17, 2020 Order. The City Defendants moved to enforce the settlement agreement. ECF No. 327. The motion was denied. ECF No. 348.

On May 7, 2021, the State Defendants filed their motion for summary judgment. ECF No. 333. When plaintiff failed to oppose the motion by the April 19, 2021 deadline, the Court deemed the

---

[16] This is with the exception of deceased defendant Conde. I recommended that plaintiff's claims against Conde should be dismissed. ECF No. 216.

[17] The parties requested, and the Court granted several extensions of the discovery deadline, ECF Nos. 254, 273, 276, 278. In 2019, the Court also granted plaintiff's request to stay this action pending her release from custody. ECF Nos. 263, 268. After four months, when plaintiff reported that she was still in custody, the Court lifted the stay and the parties resumed discovery. ECF No. 273.

[18] In late 2020, plaintiff filed several letters which the Court liberally construed as requests to re-open discovery. ECF Nos. 308, 309, 311. The requests were denied. ECF No. 314.

motion fully briefed. May 10, 2021 Order. On May 9, 2022, the City Defendants filed their motion for summary judgment. ECF No. 363. Plaintiff filed letters requesting that the Court deny the City Defendants' motion, see ECF Nos. 359, 362, 369, 370; however, plaintiff failed to oppose the motion by the July 11, 2022 deadline.[19] Judge Komitee referred defendants' motions to me for a Report and Recommendation. See Apr. 4, 2022 Order; May 12, 2022 Order.

## LEGAL STANDARDS

### I.    Summary Judgment

"Summary judgment is proper only when, construing the evidence in the light most favorable to the non-movant, 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Doninger v. Niehoff, 642 F.3d 334, 344 (2d Cir. 2011) (quoting Fed. R. Civ. P. 56(a)). A fact is material if it is one that "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "An issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 202 (2d Cir. 2007) (quoting Anderson, 477 U.S. at 248). "The trial court's function in deciding such a motion is not to weigh the evidence or resolve issues of fact, but to decide instead whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party." Pinto v. Allstate Ins. Co., 221 F.3d 394, 398 (2d Cir. 2000); see also, Baker v. Home Depot, 445 F.3d 541, 543 (2d Cir. 2006) (resolving all ambiguities and drawing all inferences in favor of the nonmoving party on summary judgment).

If the moving party meets its burden in establishing the absence of any genuine issue of material fact, "the burden shifts to the nonmovant to point to record evidence creating a genuine issue

---

[19] Judge Komitee denied any further extension of the deadline. See May 4, 2022 Order.

of material fact." Salahuddin v. Goord, 467 F.3d 263, 273 (2d Cir. 2006). The non-moving party must provide "affirmative evidence" from which a jury could return a verdict in its favor. Anderson, 477 U.S. at 257. "Conclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact." Niagara Mohawk Power Corp. v. Jones Chem., Inc., 315 F.3d 171, 175 (2d Cir. 2003) (quoting Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998)). Moreover, "[t]he 'mere existence of a scintilla of evidence' supporting the non-movant's case is also insufficient to defeat summary judgment." Id. (quoting Anderson, 477 U.S. at 252).

Where a motion for summary judgment is unopposed, the district court "may not grant the motion without first examining the moving party's submission to determine if it has met its burden of demonstrating that no material issue of fact remains for trial." D.H. Blair & Co. v. Gottdiener, 462 F.3d 95, 110 (2d Cir. 2006) (quoting Vt. Teddy Bear Co., 373 F.3d at 244 (2d Cir. 2004)). Additionally, when a plaintiff is proceeding *pro se*, as in the instant action, the Court "reads [her] papers liberally and interpret[s] them to raise the strongest arguments that they suggest." Brownell v. Krom, 446 F.3d 305, 310 (2d Cir. 2006) (quoting Jorgensen v. Epic/Sony Records, 351 F.3d 46, 50 (2d Cir. 2003)) (internal quotations omitted).

## II.    False Arrest

### a.    Probable Cause

To prevail on a claim for false arrest under 42 U.S.C. § 1983, a plaintiff must prove that "the defendant intentionally confined her without her consent and without justification." Escalera v. Lunn, 361 F.3d 737 (2d Cir. 2004) (internal quotations omitted). In the absence of a warrant or probable cause, an arrest is unconstitutional. When the underlying arrest is made without a warrant "a presumption arises that the plaintiff's arrest was unlawful." Jenkins v. City of New York, 478 F.3d 76 (2d Cir. 2007). Defendants may rebut this presumption by demonstrating that the arresting officer had probable cause to arrest. Little v. Massari, 526 F.Supp.2d 371, 374 (E.D.N.Y. 2007) (relying on

Jenkins, 478 F.3d at 88 (2d Cir 2007)). A showing that the arresting officer had probable cause to arrest is an absolute defense to a false arrest claim. Torraco v. Port Authority of N.Y. & N.J., 615 F.3d 129, 139 (2d Cir. 2010) (citing Jaegly v. Couch, 439 F.3d 149, 152 (2d Cir. 2006)).

Probable cause to arrest exists when an officer has "knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." Gonzalez v. City of Schenectady, 728 F.3d 149, 155 (2d Cir. 2013) (quoting Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996)). A probable cause determination turns on the "reasonable conclusions to be drawn from the facts known to the arresting officer *at the time of the arrest*." Devenpeck v. Alford, 543 U.S. 146, 152 (2004) (emphasis added); see also, Gonzalez, 728 F.3d 149, 155 (2d Cir. 2013) (citing Jaegly, 439 F.3d at 153 (2d Cir. 2006)).

### b. Qualified Immunity

Even if probable cause to arrest did not exist, an officer may be protected from civil damages liability by qualified immunity insofar as "[the officer's] conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231 (2009). In the context of a false arrest claim, in the absence of probable cause, an arresting officer will have qualified immunity from suit if there is "arguable probable cause to arrest." See Escalera v. Lunn, 361 F.3d 737, 743 (2d Cir. 2004). Arguable probable cause exists if either it was objectively reasonable for the officer to believe that probable cause existed, or if officers of reasonable competence could disagree on whether the probable cause test was met. Id.

## III.     Excessive Force

The Fourth Amendment prohibits the use of unreasonable, and therefore excessive, force during an arrest. Tracy v. Freshwater, 623 F.3d 90, 96 (2d Cir. 2010) (citing Graham v. Connor, 490 U.S. 386, 395 (1989)). To determine whether the force used by defendants was excessive, the court

must analyze the totality of the circumstances facing the officer, including: "(1) the nature and severity of the crime leading to the arrest, (2) whether the suspect poses an immediate threat to the safety of the officer or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight." Tracy, 623 F.3d at 96 (citing Papineau v. Parmley, 465 F.3d 46, 61 (2d Cir. 2006)).

An officer has the right to use some degree of force or the threat of force when effectuating an arrest. Graham, at 396 (citing Terry v. Ohio, 392 U.S. 1, 22–27 (1968)). As famously said in Graham v. Connor, "[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment." 490 U.S., at 396 (1989) (internal quotation omitted).

Although the extent of a plaintiff's injury is relevant, it is not a dispositive factor in evaluating an excessive force claim. Abreu v. Nicholls, 368 F. App'x 191, 193 (2d Cir. 2010) (summary order). "[I]f the force used was unreasonable and excessive, the plaintiff may recover even if the injuries inflicted were not permanent or severe." Robison v. Via, 821 F.2d 913, 924 (2d Cir. 1987); see also Hayes v. N.Y.C. Police Dep't, 212 F. App'x 60, 62 (2d Cir. 2007) (summary order) ("claims [have survived] summary judgment where the only injury alleged is bruising.") (citing Maxwell v. City of New York, 380 F.3d 106, 108 (2d Cir. 2004)); Lemmo v. City of New York, No. 08-CV-2641, 2011 WL 4592785, *8 (E.D.N.Y. September 30, 2011) ("'[A] jury may consider the lack of serious injury as evidence that the implemented force was not excessive,' while nevertheless concluding that 'intentional, gratuitous uses of force, that are not required to subdue an individual likely fail the Graham objective reasonableness test.'")[20]

---

[20] The Clerk of Court shall send plaintiff the attached copies of all the unreported cases cited herein.

**IV.    Failure to Intervene**

Under § 1983, an officer can be held liable for "the preventable harm caused by the actions of the other officers where that officer observes or has reason to know that: (1) excessive force is being used, (2) a citizen has been unjustifiably arrested, or (3) any constitutional violation has been committed by a law enforcement official." Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994) (citations omitted). To establish liability for failure to intervene, "there must have been a realistic opportunity to intervene to prevent the harm from occurring." Id. at 557. Additionally, when there is no underlying constitutional violation, a plaintiff cannot succeed on a claim for failure to intervene. Wieder v. City of New York, 569 Fed. App'x 28, 30 (2d Cir. 2014) (summary order).

**V.    Personal Involvement**

"It is well settled in this Circuit that the 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" Jones v. Parmley, 714 F. App'x 42, 46 (2d Cir. 2017) (summary order) (quoting Farrell v. Burke, 449 F.3d 470, 484 (2d Cir. 2006) (internal citations omitted)). There is no *respondeat superior* or vicarious liability under § 1983. Blyden v. Mancusi, 186 F.3d 252, 264 (2d Cir. 1999). Therefore, a plaintiff must allege the direct or personal involvement of each of the named defendants in the constitutional violation alleged. Farid v. Ellen, 593 F.3d 233, 249 (2d Cir. 2010). Personal involvement may be established by direct participation, namely "personal participation by one who has knowledge of the facts that rendered the conduct illegal," or indirect participation "such as ordering or helping others to do the unlawful acts." Provost v. City of Newburgh, 262 F.3d 146, 155 (2d Cir. 2001). "To survive a motion for summary judgment, there must be some evidence of the personal involvement of each defendant in the alleged constitutional deprivation." Ricks v. O'Hanlon, No. 07 Civ. 9849, 2010 WL 245550, at *4 (S.D.N.Y. Jan. 19, 2010) (citing Williams v. Smith, 781 F.2d 319, 323 (2d Cir. 1986)).

**DISCUSSION**

Defendants move for summary judgment on all of plaintiff's claims. The Court addresses plaintiff's claims arising from the five incidents in turn.

**I.    October 4, 2013**

Plaintiff asserts that City Defendants Matteo and Callaghan falsely arrested her at her home on October 4, 2013 when she was deemed an EDP and brought to the RUMC for a psychiatric evaluation.[21] Plaintiff also asserts a claim for excessive force against Matteo and Callaghan and for failure to intervene against Reed and Bonner. Pl. Dep. Tr. 114:6-116:1.[22]

**A.  False Arrest**

"Whether an officer is authorized to make an arrest ordinarily depends, in the first instance, on state law." Michigan v. DeFillippo, 443 U.S. 31, 36 (1979). The New York Mental Hygiene Law ("NYMHL") § 9.41 provides that:

> Any peace officer, when acting pursuant to his or her special duties, or police officer who is a member of the state police or of an authorized police department or force or of a sheriff's department may take into custody any person who appears to be mentally ill and is conducting himself or herself in a manner which is likely to result in serious harm to the person or others. Such officer may direct the removal of such person or remove him or her to any hospital specified in subdivision (a) of section 9.39 . . . .

---

[21] Plaintiff's SAC alleges that Matteo and Callaghan "entered the Plaintiff's residence without a warrant … [and] restrained her [with] no warrant or probable cause," and that Reed and Bonner arrived after plaintiff requested a Sergeant. SAC ¶¶ 20–22. The SAC does not allege that Reed or Bonner participated in plaintiff's arrest or transport to the hospital. Accordingly, plaintiff's false arrest claim as pled is only against Matteo and Callaghan. Insofar as plaintiff intended to assert a false arrest claim against Reed and Bonner, the Court grants the City Defendants' motion for summary judgment on the ground that plaintiff does not allege Reed or Bonner's personal involvement in her October 4, 2013 arrest. See Rodriguez v. City of New York, 291 F. Supp. 3d 396, 410 (S.D.N.Y. 2018) ("Courts have rejected the notion that every member of a team of officers is, by default, personally involved in every arrest effected by the team."); Travis v. Vill. of Dobbs Ferry, 355 F. Supp. 2d 740, 752–53 (S.D.N.Y. 2005) (holding that officers who were merely present at the arrest were not personally involved).

[22] Plaintiff did not plead a failure to intervene claim in her SAC; she raised the claim during her deposition. Although the claim was not properly raised by plaintiff, the Court addresses it to be complete.

The NYMHL defines "likely to result in serious harm" as: "(a) a substantial risk of physical harm to the person as manifested by threats of or attempts at suicide or serious bodily harm or other conduct demonstrating that the person is dangerous to himself or herself, or (b) a substantial risk of physical harm to other persons as manifested by homicidal or other violent behavior by which others are placed in reasonable fear of serious physical harm." N.Y. Mental Hyg. Law § 9.01. Thus, plaintiff's arrest on October 4, 2013 was permissible if defendants had probable cause "to conclude that [plaintiff] was acting in a manner that invoked Section 9.41." Amato v. Hartnett, 936 F. Supp. 2d 416, 435 (S.D.N.Y. 2013); Tsesarskaya v. City of New York, 843 F. Supp. 2d 446, 456 (S.D.N.Y. 2012) ("[The] [d]efendants' conduct is privileged where there was probable cause to believe that the individual was a danger to herself or others."). In evaluating police behavior under both § 9.41 and the Fourth Amendment, the standard is "objective reasonableness." Amato, 936 F. Supp. 2d at 435.

"The relevant probable cause inquiry converges on whether the facts and circumstances known to the officers at the time they seized Plaintiff were sufficient to warrant a person of reasonable caution to believe that [she] might be mentally ill and conducting [herself] in a manner likely to result in serious harm to [herself]." Id. (quoting Nicholas v. City of Binghamton, No. 10-CV-1565, 2012 WL 3261409, at *5 (N.D.N.Y. Aug. 8, 2012)). "Just as actual innocence will not render an arrest invalid if it is based on then-existing probable cause that criminal activity is occurring, a mental health seizure can rest upon probable cause even when the person seized does not actually suffer from a dangerous mental condition." Vallen v. Connelly, No. 99-CV-9947, 2004 WL 555698, at *5 (S.D.N.Y. Mar. 19, 2004) aff'd, 185 F. App'x 22 (2d Cir. 2006) (summary order).

Here, the City Defendants relied on plaintiff's grandparents' 9-1-1 call which reported that plaintiff was "screaming obscenities," "yelling I have bed bugs," and claiming her elderly grandfather had "beat her up." City Defs. Ex. B; see City Defs. 56.1 Stmnt. at ¶ 2.[23] Although the phone call was

---

[23] The record does not identify which grandparent made the call.

20

not anonymous and was made by a family member within the home, see Kerman v. City of N.Y., 261 F.3d 229, 236 (2d Cir. 2001) (holding there was insufficient probable cause solely based on an anonymous and uncorroborated 9-1-1 call), the 9-1-1 caller did not report being threatened by plaintiff or that plaintiff was conducting herself in a way that was likely to harm herself or others. Cf. Mittelman v. County of Rockland, No. 07-CV-6382, 2013 WL 1248623, at *12  (S.D.N.Y. Mar. 26, 2013) (the caller was an eyewitness and the victim of the threats); Glowczenski v. Taser International Inc., No. 04-CV-4052, 2010 WL 1936200, at *6 (E.D.N.Y. May 13, 2010) (a 9-1-1 call, combined with the fact that the officers had knowledge of the individual's history of mental illness, and that the family expressed fear that he might be a danger, was sufficient to find probable cause).

The City Defendants determined that plaintiff was an EDP "[b]ased on the 9-1-1 call," City Defs' 56.1 Stmt. ¶ 6, and do not report any other information that plaintiff was threatening her grandparents or acting in a way that demonstrated she was likely to harm herself or others. For example, when the officers arrived at the home in response to the 9-1-1 call, they did not report observing plaintiff behaving in a dangerous or threatening manner. Even though plaintiff reported experiencing delusions to the RUMC staff once she arrived at the hospital, the probable cause analysis is not retroactive. The relevant inquiry is whether the facts and circumstances known to the officers *at the time* plaintiff was seized were sufficient to warrant the conclusion that plaintiff might be mentally ill *and* that plaintiff was acting in a manner that would likely result in serious harm to herself or others. Amato, 936 F. Supp. 2d at 435 (emphasis added). Here, although plaintiff may have been acting strangely, there was no report of dangerous behavior in the 9-1-1 call and there is nothing in the record to demonstrate that the officers observed plaintiff as a danger to herself or others. Johnson v. Myers, No. 10-CV-1964, 2014 WL 2744624, at *10 (E.D.N.Y. June 16, 2004) ("[t]o handcuff and detain, even briefly, a person for mental-health reasons, an officer must have 'probable cause to

believe that the person presented a risk of harm to [her]self or others.'") (quoting <u>Kerman</u>, 261 F.3d at 237), <u>vacated and remanded on other grounds</u>, 819 F.3d 625 (2d Cir. 2016).

Based on the instant record construed in the light most favorable to plaintiff, it was not objectively reasonable for the officers to seize plaintiff. There is a genuine issue of fact as to whether the officers had probable cause or arguable probable cause to believe that plaintiff was acting in a manner that could result in serious harm to herself or others. Therefore, I recommend that the City Defendants' motion for summary judgment on plaintiff's false arrest claim against Matteo and Callaghan regarding the October 4, 2013 incident should be denied.

**B. Excessive Force and Failure to Intervene**

First, plaintiff alleges that Matteo and Callaghan used excessive force when the officers carried plaintiff down the stairs and "body slammed" her, causing her face to hit the ground. Pl. Dep. Tr. 95:15-96-1. The officers claim that plaintiff was "placed," not body slammed, on the ground. The "details" section of the Emergency Service Unit Report for that date only states: "Crew used assisted [EDP] down stairs of location." ("ESU Report"), ECF No. 365-3. The City Defendants do not attach affidavits from any of the October 4, 2013 arresting officers regarding what happened on that date. Accordingly, whether Matteo and Callaghan used excessive force should not be decided on the instant motion. <u>See</u> <u>Amnesty Am. v. Town of West Hartford</u>, 361 F.3d 113, 123 (2d Cir. 2004) ("Given the fact-specific nature of the inquiry, granting summary judgment against a plaintiff on an excessive force claim is not appropriate unless no reasonable factfinder could conclude that the officers' conduct was objectively unreasonable.")

Second, plaintiff alleges that Reed and Bonner failed to intervene when Matteo and Callaghan allegedly "body slammed" her. The City Defendants' motion does not address plaintiff's failure to intervene claim. <u>See generally</u>, City Def's Memorandum of Law ("City Def's Mem."), ECF No. 366. However, even viewing the record in the light most favorable to plaintiff, plaintiff's allegation that

22

Matteo and Callaghan "body slammed" her after carrying her down the stairs would not have afforded Reed and Bonner a realistic opportunity to intervene or stop this alleged discrete use of excessive force. Anderson, 17 F.3d at 557; see, e.g., Raffaele v. City of New York, 242 F. Supp. 3d 152, 158 (E.D.N.Y. 2017) (granting summary judgment on failure to intervene claim because "there was not enough time for any officer, from a distance of six to ten feet, to intervene between a push and a hit occurring in a two-second span"); Elufe v. Aylward, No. 09-CV-458, 2011 WL 477685, at *9 (E.D.N.Y. Feb. 4, 2011) ("Where the alleged force consists of a single push or a 'rapid succession' of blows, courts have found that the officer did not have a realistic opportunity to intervene.") (internal citations omitted). Accordingly, the City Defendants' motion for summary judgment on plaintiff's failure to intervene claim against Reed and Bonner for the October 4, 2013 incident should be granted, and those claims should be dismissed.

Third, plaintiff alleges that defendant Callaghan used excessive force when he tried to "break her arm" while was she was in a hospital bed at RUMC later that day. Plaintiff described feeling "radiating pain from the shoulder to the wrist." Pl. Dep. Tr. 110:13-16. The City Defendants' Motion states that "while Officer Callaghan did use force to hold plaintiff down," "plaintiff was being combative with hospital staff," and that no reasonable jury would credit that Callaghan would "attempt to break [plaintiff's] arm for no reason." City Defs' Mem. at 22. Again, the City files no affidavit from defendant Callaghan setting forth his account of what happened with plaintiff on that day.

Instead, the City Defendants argue that the Court should disregard plaintiff's version of events because she was taken to the hospital for a psychiatric evaluation and admitted to experiencing hallucinations. However, "[a]ssessments of credibility and choices between conflicting versions of . . . events are matters for the jury, not for the court on summary judgment." Jeffreys v. City of New York, 426 F.3d 549, 553-54 (2d Cir. 2005) (quoting Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir.

1996). The narrow exception to this rule is when a plaintiff relies "almost exclusively on his own testimony, much of which is contradictory and incomplete." <u>Frost v. New York City Police Dep't</u>, 980 F.3d 231, 245 (2d Cir. 2020) (quoting <u>Jeffreys</u>, 426 F.3d at 554). Since plaintiff's testimony regarding this event is not contradictory, the Court declines to discredit plaintiff's deposition testimony. Whether a jury would credit plaintiff's testimony that the City Defendants used unreasonable force during her arrest and at the hospital is another matter, but this should not be decided on the instant motion. Thus, the City Defendants' motion for summary judgment on plaintiff's excessive force claims against Matteo and Callaghan regarding the October 4, 2013 incident should be denied.

## II.    April 9, 2014

Plaintiff claims that on April 9, 2014, City Defendants Ferretti and Adams falsely arrested her for trespassing at the ACS Office and later that day, when she was brought to the 120th precinct for processing after her arrest, City Defendants Delapena and Singer used excessive force against her.

### A.  False Arrest

Plaintiff was arrested for trespassing at the ACS Office on April 9, 2014. Under N.Y.P.L. § 140.05, "a person is guilty of trespass when [she] knowingly enters or remains unlawfully in or upon premises." Here, there is a dispute of fact as to whether or not plaintiff was asked to leave the premises before she was arrested. Plaintiff testified that she was never asked to leave by ACS staff, nor by the members of the NYPD who arrived at the scene. <u>See</u> Pl. Dep. Tr. 118:17-20, 128:15-25. The State Defendants say that an ACS worker called 9-1-1 to make a complaint against plaintiff because ACS asked plaintiff to leave several times, and plaintiff refused. Defendant Ferretti's report states that when he and Adams came to the scene, the officers also asked plaintiff to leave, she refused, and after about 30 minutes, the officers arrested her. <u>See</u> ECF No, 365-14 ("Ferretti Deposition").

Even accepting plaintiff's version of this event, that ACS lied to the officers when they said that they asked plaintiff to leave the office, Pl. Dep. Tr. 129:3-11, defendants still had probable cause to arrest plaintiff. Probable cause to arrest still exists based on mistaken information, "so long as the arresting officer acted reasonably and in good faith in relying on that information." Torres v. City of N.Y., No. 20-cv-4007, 2022 WL 955152, at *3 (E.D.N.Y. Mar. 30, 2022) (citing Bernard v. United States, 25 F.3d 98, 102 (2d Cir. 1994); see also Martinez v. Simonetti, 202 F.3d 625, 634 (2d Cir. 2000) (there is "probable cause to arrest if [the arresting officer] received his information from some person, normally the putative victim or eyewitness, who it seems reasonable to believe is telling the truth.") Here, it was reasonable for the officers to rely on the information ACS communicated to them. Accordingly, the officers had probable cause to arrest plaintiff for trespassing and I recommend that defendants' motion for summary judgment should be granted on plaintiffs' false arrest claim regarding the April 9, 2014 incident.[24]

## B. Excessive Force

Plaintiff's excessive force claim on April 9, 2014 stems from a separate incident at the 120th precinct where she was brought for processing after her arrest. Plaintiff alleges that Officer Singer pushed her against a wall and that Singer, or Officer Delapena, threatened to kill her.[25] Plaintiff does not allege any injury as a result of the incident. The City Defendants move for summary judgment on plaintiff's claim because (1) plaintiff's claims are "absurd," (2) she has not "adduced any evidence to suggest this even occurred" and (3) plaintiff was not injured by the alleged push. City Defs. Mem. at 22–23.

---

[24] Even if there was not probable cause to arrest plaintiff, there was at least arguable probable cause based on the information conveyed to the officers.

[25] See supra note 11.

Insofar as plaintiff asserts a claim against Delapena for threatening her, the claim must be dismissed because, "verbal harassment or profanity alone, unaccompanied by any injury, no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983." Little v. Municipal Corp., 51 F.Supp.3d 473, 500 (S.D.N.Y. 2014) (quoting Hare v. Hayden, No. 09-CV-3135, 2011 WL 1453789, at *7 (S.D.N.Y. Apr. 14, 2011). Therefore, Delapena's motion for summary judgment regarding the April 19, 2014 incident should be granted. However, plaintiff's allegation that Singer shoved her into a wall is a different matter. The City files no affidavit from defendant Delapena or Singer, setting forth their account of what happened with plaintiff on that day. Because defendants fail to establish that there is no material issue of fact in dispute, defendant Delapena's motion should be granted but defendant Singer's motion should be denied as to plaintiff's excessive force claim regarding the April 9, 2014 incident.

### III.    March 20, 2015

Plaintiff asserts a false arrest claim against City Defendants Ferretti and Adams and several unidentified NYPD officers and State Defendants Bonanno, Botta, and Toscanini regarding the March 20, 2015 incident when she was deemed an EDP and arrested at the RFC. Plaintiff also asserts an excessive force claim against Ferretti and Adams and EMTs Caruso and Howe for the manner in which she was placed in the ambulance for transfer to the hospital following her arrest.

#### A. False Arrest

##### 1. The State Defendants

The State Defendants move for summary judgment on plaintiff's false arrest claim on the ground that no reasonable factfinder could conclude that the Court Officers arrested plaintiff on March 20, 2015. During her deposition, plaintiff testified that Toscanini and Botta stood around her and blocked her from leaving the building while they waited for the NYPD to arrive, Pl. Dep. Tr.

26

384:13-1, and that Bonanno allowed the two Court Officers to detain her, because he is their supervisor, id. at 383:20-24. Specifically, plaintiff testified that the Court Officers "made it clear that [she] couldn't leave, physically and verbally," Pl. Dep. Tr. 433:2-4, and that after "five to seven minutes" the Court Officers "transferred detainment custody to the City Defendants" id. 434:4-8.[26] The State Defendants argue that none of these events took place and that it is "illogical" that defendants would block plaintiff from the exit rather than handcuffing her and moving her out of a highly trafficked, public area. See State Defs. Mem. at 14. However, even accepting plaintiff's version of the events as true, as I must, defendants' actions did not violate plaintiff's constitutional rights as a matter of law.

In assessing whether a stop or detention amounts to a *de facto* arrest, the Court looks to the amount of force used, the need for such force, and the extent to which the suspect's freedom of movement was restrained. United States v. Vargas, 369 F.3d 98, 101 (2d Cir. 2004). "In particular, we consider the number of officers involved, whether the target of the stop was suspected of being armed, the duration of the stop, and the physical treatment of the suspect, including whether handcuffs were used." United States v. Santillan, 902 F.3d 49, 61 (2d Cir. 2018) (citing United States v. Perea, 986 F.2d 633, 645 (2d Cir. 1993)).

Here, the short duration of the stop, the lack of any use of force, and the fact that plaintiff's movement was not restrained physically in any way would prevent a reasonable juror from concluding that the State Court Officers arrested plaintiff. Accordingly, Toscanini and Botta's motion for summary judgment regarding plaintiff's false arrest claim against them should be granted. Separately, Bonanno moves for summary judgment on the basis that Bonanno cannot be held vicariously liable as a matter of law. The Court agrees. Bonanno's motion for summary judgment should also be granted

---

[26] Plaintiff did not allege that the Court Officers prevented her from leaving the RFC in the SAC or in the previous version of her complaint.

because plaintiff does not allege his personal involvement in this incident and there is no basis for supervisory liability under Section 1983. Blyden v. Mancusi, 186 F.3d 252, 264 (2d Cir. 1999).

### 2. The City Defendants

#### a. Mental Health Arrest

The City Defendants move for summary judgment on plaintiff's false arrest claim on the ground that there was probable cause to arrest plaintiff as an EDP on March 20, 2015.[27] As discussed in Section I, above. The relevant probable cause inquiry for an involuntary mental health hospitalization is whether, "the facts and circumstances known to the officers at the time they seized Plaintiff were sufficient to warrant a person of reasonable caution to believe that [she] might be mentally ill and conducting [herself] in a manner likely to result in serious harm.'" Amato, 935 F. Supp. 2d at 435.

Here, as with the October 13, 2013 arrest, the City Defendants do not set forth any basis for believing that plaintiff was acting in a manner likely to result in harm to herself or others. Before contacting EMS for assistance, State Defendant Botta witnessed plaintiff yelling that Judge Wolff was a terrorist, ordering the Court Clerks to arrest Judge Wolff, and obstructing other Court users from accessing the Clerk's window. See Botta Decl. ¶¶ 17–18. Botta believed that there was probable cause to arrest plaintiff for disorderly conduct; however, because of plaintiff's erratic behavior and his knowledge of plaintiff's repeated 9-1-1 calls to the courthouse, he believed the situation was more appropriately treated as a psychiatric issue. Id. ¶¶ 19–21.

Although plaintiff was acting in a bizarre and disruptive manner, the State Defendants do not allege that plaintiff was threatening to harm herself or others. They also do not state that the officers observed plaintiff as a threat to herself or others. Therefore, there is a material dispute of fact as to

---

[27] The NYPD officers arrived at the scene in response to the 9-1-1 call placed by plaintiff and EMS arrived in response to a call placed by State Defendant Botta.

whether the officers had probable cause to arrest plaintiff as an EDP as a matter of law. However, defendants did have probable cause, or at least arguable probable cause, to arrest plaintiff for disorderly conduct, as set forth below in Section III. A. 2. b.

In general, a plaintiff cannot recover on a false arrest claim if there was probable cause to arrest for any criminal violation. Jaegly, 439 F.3d at 154 ("it is not relevant whether probable cause existed with respect to each individual charge, or, indeed, any charge actually invoked by the arresting officer at the time of the arrest…[because] damages […] stem from injuries associated with the detention itself, and not with the individual charges."). Recently, however, the Second Circuit held that probable cause for a criminal arrest does not preclude a claim for a false mental health arrest. Guan v. City of New York, 37 F.4th 797, 808 (2d Cir. 2022). In other words, prior to the Guan decision, it was not clearly established law that police officers "had to make a separate probable cause determination to arrest the person for an emergency psychiatric evaluation." Id. at 809. When plaintiff was arrested in 2015, "no case had made clear by then that police officers could not arrest an individual for a mental health arrest when probable cause existed for a criminal arrest, without an additional finding of dangerousness." Id. (referring to a 2017 arrest). Accordingly, defendants Ferretti, Adams, and the unidentified NYPD officers who arrested plaintiff on March 20, 2015 are protected by qualified immunity because the law was not clearly established that they had to have probable cause to arrest plaintiff as an EDP when they had probable cause, or at least arguable probable cause, to arrest plaintiff for disorderly conduct.

**b. Disorderly Conduct Arrest**

Pursuant to the N.Y.P.L. § 240.20, "[a] person is guilty of disorderly conduct when, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof: (1) he engages in fighting or in violent, tumultuous or threatening behavior; (2) he makes unreasonable noise …" N.Y.P.L. § 240.20(1)-(2). Disorderly conduct has three elements: the defendant's conduct (1)

29

"must match at least one of the descriptions set forth in the statute"; (2) "be 'public' in nature"; and (3) "be done with 'intent to cause public inconvenience, annoyance or alarm' or with recklessness as to 'a risk thereof.'" Provost v. City of Newburgh, 262 F.3d 146, 157 (2d Cir. 2001). Importantly, "'a defendant may be guilty of disorderly conduct regardless of whether the action results in public inconvenience, annoyance or alarm," as long as the conduct 'recklessly creates a risk of such public disruption.'" Hughes v. Lebron, No. 14 Civ. 9479, 2016 WL 5107030, at *8 (S.D.N.Y. Sept. 19, 2016) (quoting People v. Weaver, 16 N.Y.3d 123, 128 (2011)). "[B]ecause the practical restraints on police in the field are greater with respect to ascertaining intent . . ., the latitude accorded to officers considering the probable cause issue in the context of mens rea crimes must be correspondingly great." Zalaski v. City of Hartford, 723 F.3d 382, 393 (2d Cir. 2013).

Plaintiff was making unreasonable noise, acting out in the Family Court, yelling that Judge Wolff was a "terrorist," and yelling at the Deputy Clerk to arrest Judge Wolff. Botta Decl. ¶ 17; see also, Aided Report, ECF No. 340-4. In addition, just the day before, plaintiff had stood up during Court proceedings, yelled at Judge Wolff, and attempted to effectuate a citizen's arrest of the Judge. Unusual Occurrence Report, ECF No. 340-3.

The courthouse waiting room is indisputably a public place. See Hughes, 2016 WL 5107030, at *9 ("[the courthouse waiting room] is a setting in which even a minor disturbance may rise to the level of a 'public problem.'" (quoting Provost v. City of Newburgh, 262 F.3d 146, 157 (2d Cir. 2001)).

Finally, it was reasonable for the officers to believe that plaintiff acted with a recklessness to the risk of disturbing the public. These facts and the surrounding circumstances were sufficient for a reasonable officer to conclude that plaintiff had committed disorderly conduct. Accordingly, there was probable cause, or at least arguable probable cause, for the defendant NYPD Officers to arrest plaintiff on March 20, 2015. Therefore, the City Defendants' motion for summary judgment should

be granted, and plaintiff's claim for false arrest regarding the March 20, 2015 incident should be dismissed.

### B. Excessive Force

Plaintiff alleges that when defendant Officers Ferretti and Adams and EMTs Caruso and Howe placed her on a stretcher to transport her to the hospital for an EDP evaluation, defendants used excessive force to secure her to the stretcher.[28] Specifically, plaintiff alleges that all four men put their body weight on her. Pl. Dep. Tr. 147:8-25. Defendants allege that plaintiff threatened the officers and refused to be seat belted while they attempted to secure plaintiff to the stretcher. 5/20/15 Rep. Plaintiff admits that she kicked Officer Ferretti face and was charged with Assault in the Second Degree Pl. Dep. Tr. 150:24-151:7. Plaintiff does not allege any injury from this event.

Viewing the record in the light most favorable to plaintiff, defendants' motion for summary judgment should be granted and plaintiff's claim of excessive force should be dismissed as plaintiff was actively resisting arrest and the force defendants used was reasonable in order to subdue plaintiff. As discussed above, the officers had probable cause to arrest plaintiff and although plaintiff claims she was not resisting being placed on the stretcher for transport, she admits that she kicked Ferretti in the face which acknowledges she was struggling with the officers. That plaintiff kicked defendant Ferretti coupled with the fact that plaintiff experienced no injury as a result of the transport to the hospital on this date would preclude a reasonable juror from finding that the officers used excessive force against plaintiff. See Quon, 2017 WL 1406279, at *31 (officers were entitled to judgment on EDP plaintiff's excessive force claim where plaintiff resisted arrest and "scuffle[d]" with the arresting officers); Turturro v. Cont'l Airlines, No. 00 CIV. 637, 2005 WL 14670, at *7 (S.D.N.Y. Jan. 3, 2005) (pushing on EDP plaintiff's shoulders and legs to get plaintiff into ambulance to transport for

---

[28] Plaintiff testified that no force was used in handcuffing her or removing her from the premises. Pl. Dep. Tr. 145:10-18.

psychiatric evaluation did not amount to excessive force). Accordingly, the City Defendants' motion for summary judgment on plaintiff's excessive force claim regarding the March 20, 2015 incident should be granted.

## IV.   June 24, 2015

Plaintiff asserts a false arrest claim against City Defendants Portee and Zubyk and State Defendant Sicilia[29] regarding the June 24, 2015 incident when she was arrested at the RFC office for disorderly conduct. She also asserts an excessive force claim against Portee and Zubyk and State Defendant Bonanno.

### A.   False Arrest

Defendant officers had probable cause to arrest plaintiff for disorderly conduct on June 24, 2015. On this date, plaintiff called 9-1-1 to summon the police to the RFC waiting room, even though there was no emergency. As captured by the video, the police arrived and plaintiff attempted to avoid them, quickly crossing the waiting room. Plaintiff alleges that Portee "charged" her, but this is not what the video shows. When the officers reach plaintiff, a scuffle breaks out. Plaintiff admits to wrapping her legs around Portee and kicking another officer in the groin. Pl. Dep. Tr. 172:7-11; 512:21-24. Thus, in the moments leading up to plaintiff's arrest, plaintiff engaged in aggressive conduct towards the officers.

As previously discussed, the courthouse waiting room is inarguably a public place. At the time of the incident, it was mid-morning, and the Video shows a number of people in the waiting room. Several individuals move from their seats to avoid the commotion.

Finally, it was reasonable for the officers to believe that plaintiff acted with a recklessness to the risk of disturbing the public. Accordingly, there was probable cause, or at least arguable probable

---

[29] Plaintiff testified that she is not asserting a false arrest claim against Lepore, Botta, or Bonanno. See Pl. Dep. Tr. 275:13-18, 277:22-24, 342:7-18.

cause, for defendants to arrest plaintiff for disorderly conduct on June 24, 2015. Therefore, defendants' motions for summary judgment should be granted, and plaintiff's claim for false arrest regarding the June 24, 2015 incident should be dismissed.

## B.  Excessive Force

Plaintiff alleges that during the June 24, 2015 arrest at the RCF she was "body-slammed" to the floor in the hallway outside the RFC waiting room by City Defendants Portee and Zubyk, State Defendant Bonanno,[30] and other unidentified officers after she had been handcuffed, causing body-wide severe pain, shortness of breath, bruising, and swelling to plaintiff's body. SAC ¶ 139-140.

The City Defendants argue that their motion for summary judgment on plaintiff's false arrest claim should be granted because (1) "no such 'body-slam'" is seen on the Video, (2) plaintiff testified at her deposition that she tripped and fell to the ground, and (3) that any force used by the officers was "to get plaintiff into handcuffs [and was] reasonable in light of plaintiff resisting arrest." State Def's Mem. at 24. This mischaracterizes plaintiff's deposition testimony.

The RFC video surveillance footage only captured what happened in the courthouse waiting room. There, plaintiff is on the ground twice. Part of the waiting room encounter is captured by the Video, but the other part is not because plaintiff is beyond the Video's frame. Video 10:28:01-10:28:05. Plaintiff admits during her deposition that in both instances when she is on the ground in the waiting room, she tripped.  Pl. Dep. Tr. 295:17-19. However, plaintiff alleges that when defendants brought her out of the waiting room and into the hallway, the officers "body slammed" her to the floor. Pl. Dep. Tr. 159:24-160:7, 331:5-21 ("At the end of the video, when we exited out of the lobby area, that's where the hallway was and that's where they took me down facedown."). The Video therefore does not capture plaintiff's excessive force claim. The City Defendants do not address

---

[30] Plaintiff testified that State Defendant Sicilia was not involved in the hallway incident. Pl. Dep. Tr. 278:20 to 279:1.

plaintiff's allegation that she was body-slammed in the hallway. Accordingly, defendant Portee and Zubyk's motion for summary judgment on plaintiff's excessive force claim on June 24, 2014 should be denied.

The State Defendants move for summary judgment on plaintiff's excessive force claim against defendant Bonanno for lack of personal involvement. Bonanno denies having any physical contact with plaintiff June 24, 2015. See Bonanno Decl. Plaintiff testified that she did not know if any of the State Court Officers made physical contact with her in the hallway. Tr. 332:20 to 333:12. To show personal involvement, the plaintiff must prove "a tangible connection between the acts of a defendant and the injuries suffered" by the plaintiff. Bass v. Jackson, 790 F.2d 260, 262 (2d Cir. 1986). Bonanno's mere presence at the Courthouse on the date of the incident is insufficient. Accordingly, the State Defendants' motion for summary judgment on plaintiff's excessive force claim against Bonanno should be granted due to lack of personal involvement.

## V.    August 12, 2015

Plaintiff asserts a false arrest and excessive force claim against Terrance Hurson and other unspecified City Defendant police officers for the August 12, 2015 incident where she was arrested at her home as an EDP.[31]

---

[31] Plaintiff's SAC alleges false arrest and excessive force against the following 29 individuals: Terence Hurson, Edward Leisengang, Brian Johnson, Richard Ocasio, Robert Talatala, Ralph Conde, Steven Consentino, Derek Dehorta, Sean McHugh, Alfred Lobaito, Matthew Muscarello, Patricia O'Brien, Henry Rivero, Ronald Zedalis, Paul Fazio, Paul Mellone, George Bonner, Genee Parker, Nicholas Gravino, Sean Patterson, Edward Waszak, Vlad Green, Michael Lagan, James Coll, Michael O'Neill, Nicholas Gentile, Matthew Brander, Andrew Leiper, and Nicholas Scianna. SAC ¶ 163. She specifically names only Terrance Hurson. Id. at ¶ 174 ("NYPD ESU in SWAT Gear and Terence Hurson entered twice after breaking in the Plaintiff's home … and illegally detaining the Plaintiff."). At her deposition, plaintiff testified that "well over ten" officers entered her home to detain her but that she could not identify any of them because "they all were wearing SWAT gear." Pl. Dep. Tr. 188:1-7.

**A. False Arrest**

The City Defendants assert that there was probable cause, or at least arguable probable cause, to detain plaintiff on August 12, 2015 as an EDP. The Court agrees.

NYPD officers arrived at plaintiff's home in response to non-party social worker Whaley's 9-1-1 call which reported that plaintiff was acting paranoid and delusional in response to his attempt to conduct a mental health check and that she needed to be brought to the hospital. Whaley 911 Call. Further, once the officers arrived at her home, plaintiff barricaded herself inside, refused to speak to the officers for periods of time, and was observed walking around the home with a knife. Parker Report. Plaintiff admits to holding the knife, although she says that her intent was merely to wash it. Pl. Dep. Tr. 183:6-8, 185:20-21. Here, it was reasonable for the officers to rely on the information provided during the 9-1-1- call. Additionally, upon arriving at plaintiff's home, the officers observed plaintiff barricading herself inside the home, making bizarre, paranoid remarks, and behaving in a threatening manner. Accordingly, considering the totality of these circumstances, it was reasonable for the arresting officers to believe that plaintiff was acting in a manner likely to result in harm to herself or others. Amato, 936 F. Supp. 2d at 435; see e.g., Quon, 2017 WL 1406279, at *10 (finding probable cause to detain and hospitalize a plaintiff who barricaded himself in his apartment, refusing to allow firefighters to investigate a leak); Heller v. Bedford Cent. Sch. Dist., 144 F. Supp. 3d 596, 622 (S.D.N.Y. 2015), aff'd, 665 F. App'x 49 (2d Cir. 2016) (summary order) (finding probable cause to detain and hospitalize plaintiff who made "bizarre, delusional and potentially homicidal statements"); Heilbut v. City of New York, No. 04-cv-4332, 2006 WL 2807722, at *4 (S.D.N.Y. 2006) (finding probable cause to detain and hospitalize plaintiff who resisted a court order permitting entry into his apartment and behaved aggressively). Even if the officers lacked probable cause, they would be entitled to qualified immunity on these facts. See Thomas v. Culberg, 741 F. Supp. 77, 80 (S.D.N.Y. 1990) (officer entitled to qualified immunity after hospitalizing a plaintiff who was

behaving in a bizarre manner). For these reasons, I recommend that defendants' motion for summary judgment on plaintiff's August 12, 2015 false arrest claim should be granted because the officers had probable cause to detain plaintiff as an EDP, or at a minimum, are entitled to qualified immunity regarding plaintiff's false arrest claim.

### B. Excessive Force

Plaintiff testified that the arresting officers used excessive force when they took her to the ground, and that as a result of her arrest, she suffered a bruise to her knee. Pl. Dep. Tr. 188:8-16. The City Defendants argue that plaintiff's claim should be dismissed because her alleged injury was *de minimis* and unsubstantiated and because plaintiff has not established any individual defendant's specific personal involvement in the event. City Def's Mem. at 23. The Court agrees.

Construed in the light most favorable to plaintiff, defendants' motion for summary judgement should be granted. Plaintiff was observed with a knife and had been reported as acting paranoid and delusional by the social workers sent to her home for a mental health check. Defendants had a serious concern for plaintiff's physical safety and the safety of others. Additionally, plaintiff barricaded herself in her home for hours and, at times, refused to speak to the police or social workers. Accordingly, considering the totality of the circumstances, the arresting officers' use of force to take plaintiff into custody was reasonable. Therefore, the City Defendants' motion for summary judgment should be granted, and plaintiff's claim regarding excessive force on August 12, 2015 should be dismissed.

On a second, independent ground, the claim should be dismissed because plaintiff has neither alleged the specific officers involved in this incident in her SAC other than Hurson, nor has she testified which officers, or even how many officers, were involved in her arrest and the alleged use of excessive force. See Pl. Dep Tr. 332:20-333:12. Section 1983 requires personal involvement by the defendants in any alleged constitutional violation as a prerequisite to an award of damages.

36

Hernandez v. Keane, 341 F.3d 137, 144–45 (2d Cir. 2003). Therefore, plaintiff's claims against the unidentified officers regarding the August 12, 2015 incident must be dismissed. See Fisk v. Letterman, 401 F. Supp. 2d 362, 375 (S.D.N.Y 2005) (dismissing § 1983 claim where plaintiff's allegations referred to the defendants collectively and only one named defendant was alleged to have violated the plaintiff's rights).

**CONCLUSION**

Accordingly, is respectfully recommended that the State Defendants' motion for summary judgment should be granted[32] and that the City Defendants' motion for summary should be granted in part and denied in part.

The City Defendants' motion for summary judgment should be granted on the following claims: plaintiff's failure to intervene claim against Reed and Bonner regarding the October 4, 2013 incident; plaintiff's false arrest claim against Ferretti and Adams and excessive force claim against Delapena regarding the April 9, 2014 incident; plaintiff's false arrest and excessive force claims against Ferretti, Adams, and unidentified NYPD officers regarding the March 20, 2015 incident; and plaintiff's false arrest and excessive force claims against Hurson and other unspecified NYPD officers regarding the August 12, 2015 incident. Those claims against defendants should be dismissed.

The City Defendants' motion for summary judgment on plaintiff's false arrest and excessive force claims against Matteo and Callaghan regarding the October 4, 2013 incident, plaintiff's excessive force claim against Singer regarding the April 9, 2014 incident, and excessive force claim against Portee and Zubyk regarding the June 24, 2015 incident should all be denied

_____

[32] The State Defendants' motion for summary judgment on plaintiff's false arrest and excessive force claim against Bonanno, Botta, and Toscanini regarding the March 20, 2015 incident and plaintiff's false arrest claim against Sicilia and excessive force claim against Bonanno regarding the June 24, 2015 incident should be granted and those claims should be dismissed.

Plaintiff's claims in the SAC against City Defendants Matteo, Callaghan, Singer, Portee, and Zubyk should proceed; all other claims should be dismissed.

## FILING OF OBJECTIONS TO REPORT AND RECOMMENDATION

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen days from service of this Report to file written objections. See Fed. R. Civ. P. 6. Such objections shall be filed with the Clerk of the Court. Any request for an extension of time to file objections must be made within the fourteen-day period. Failure to file a timely objection to this Report generally waives any further judicial review. Marcella v. Capital Dist. Physicians' Health Plan, Inc., 293 F.3d 42 (2d Cir. 2002); Small v. Sec'y of Health and Human Servs., 892 F.2d 15 (2d Cir. 1989); see Thomas v. Arn, 474 U.S. 140 (1985).

SO ORDERED.

_____/S/_____
LOIS BLOOM
United States Magistrate Judge

Dated: August 5, 2022
        Brooklyn, New York